May it please the Court, good morning. Scott Jerger on behalf of League of Wilderness Defenders, Blue Mountains Biodiversity Project. I'd like to reserve four minutes of my time for rebuttal. Before I jump into the merits of this case, I'd like to briefly address the government's argument that this Court lacks jurisdiction pursuant to Section 1291 because there's no final judgment. There is, in fact, a final judgment in this case on the in-fish, pack-fish claims which we've appealed and which I'm going to refer to as the in-fish claims. There still was a remand here, correct? Excuse me? There was a remand. Correct. There was a partial vacatur of the decision and a very narrow remand on the one issue of cumulative impacts. And as a consequence of that partial vacatur, the project is moving forward and being implemented today with herbicide spraying on the forest. Additionally, the Forest Service has stated in the Federal Register that they'll only be reconsidering the cumulative impacts analysis on remand and not the in-fish, pack-fish issues. This circuit is held in Sierra Forest Legacy and the recent Honolulu traffic case, which we mentioned in our 28-J letter, that such a narrow remand doesn't defeat this Court's jurisdiction on the unquestionably final dismissal of the in-fish claims. The government's position in its briefing is based on the position that Sierra Forest Legacy is an aberration of Ninth Circuit law. Subsequent to the briefing, however, this Court endorsed the logic of Sierra Forest Legacy and Honolulu traffic. And far from an aberration, all of the cases cited by the parties in the briefing can be read harmoniously because they contain a common thread, which is this. The cases relied on by the government, Alce Valley, Pitt River, to challenge jurisdiction resulted in very broad remands where the agency was tasked to revisit the entire project. There was nothing moving forward on the ground, and the plaintiff could potentially get all the relief they sought on remand. Here, in contrast, as in Sierra Forest Legacy and in the recent Honolulu traffic case, the district court only partially and narrowly remanded the case to reconsider one aspect of the Forest Service's NEPA analysis, thus resulting in a meaningless remand for purposes of the in-fish claims and allowing a portion of the project, practically allowing a portion of the project to move forward. When a case is only partially remanded, as this Court said in Honolulu traffic, there is unquestionably final dismissal of the remainder of the claims because the final judgment rule deals in practice and not in theory. And for practical purposes, there's no reason that there's not final judgment on the in-fish claims. The district court has finally resolved those claims, narrowly remanded the case to the Forest Service on a very specific separate legal issue. The Forest Service has stated in the Federal Register they don't intend to consider anything other than that specific issue, and the Forest Service is moving forward with spraying today in the riparian areas. In fact, substantial spraying is occurring on the forest. 2,500 acres of riparian acres of the total 6,000 acres of the project can move forward under the remand. So that's about 40 percent of the project moving forward today as we speak. To conclude, asking Blue Mountains to participate in a remand before seeking judicial review, which is the Forest Service's position, is, as this Court said in Skagit County, promoting a meaningless remand and inviting Blue Mountains to a party with no cake while herbicide spraying continues on the forest. So on the merits. Yes. Turning to the merits. Why would I be wrong in thinking that your complaint is really just of the most technical nature, that you just want it in a different format as opposed to any difference in substance? Because that's, I guess, the impression I came away with after reviewing the record. Well, you know, the NFISH-PACFISH standards aren't a backwater standard of the Forest Plan, but rather it's the Forest Service's own standard for assessing riparian impacts on the forest. The Forest Service argues that it's not required to analyze compliance with every environmental law, and therefore it's not required to analyze compliance with PACFISH-NFISH. But we're not asking the agency to analyze compliance with every environmental law, rather just compliance with NFISH, and this is because the agency has an obligation. Why don't you talk a little slower, please? Sure. Sorry, Your Honor. If you move the mic a little bit closer, I think it'll be easier for Judge Craig to hear. Is that better? Yes. It'll be better if you just talk to us instead of read. Okay. The agency has an obligation. Well, I started to hear where you're going. You're not zeroing in on, I guess, my issue. It seems to me they did consider all of the relevant criteria that the NFISH standard requires them to do. They just did it in a different place, and they didn't do it in maybe the preferred format that you would like. But in terms of the substance, didn't they consider all of the relevant criteria? No, they didn't, and here's why, Your Honor. The Forest Service considered the impacts to fish in the aquatic environment in the context of their Endangered Species Act analysis, alleging that this is an adequate proxy for the NFISH PACFISH analysis. But if you examine their findings and conclusions in the EIS, in the context of the ESA analysis, you'll find that they're clearly not the same findings and conclusions that you would need to make to determine consistency with PACFISH and NFISH. For example. Can you give one example? Yes. One or two examples. I will give you two examples. First, the EIS only looks at impacts to listed fish, threatened or endangered fish, under the Endangered Species Act. Quote, aerial spraying of picloram, which is an herbicide, may result in concentrations of herbicide that may affect listed species and their critical habitat. Further on, the EIS goes on to state, listed fish will not be exposed to the effects of increased stream temperature. Now, the problem with this is that NFISH prohibits impacts to a wide variety of inland native fish species that aren't protected or listed under the ESA. For example, Red Band Trout, West Slope Cutthroat Trout, Yellowstone Trout. And the EIS acknowledges that Red Band Trout is widely distributed throughout the forest. Right. I still don't get the connection yet. Right. You've got to zero in. Let me put it this way. The ESA analysis also, in terms of geographic scope, only looks at critical habitat, which is streams that are designated critical habitat for salmon on the forest. But under Pack Fish and NFISH, all streams in the forest need to be considered, not just the critical habitat stream. Well, is there anything unique about the non-critical habitat streams? Yes. The ESA analysis excludes, for example, all streams used by bull trout, because bull trout didn't have any critical habitat at the time this EIS was prepared. And that's a really good example because this is what shows the Catch-22 and the problem with their proxy analysis. Prior to the EIS, the government had decided that bull trout critical habitat did not need to be designated because NFISH provided superior protection. Then the EIS analyzes impacts to bull trout by looking at critical habitat, of which there is none on the forest, and ignores the NFISH protections for bull trout. That effectively reads NFISH compliance out of existence, and bull trout effects aren't analyzed in the EIS. You said you had two examples. Well, the two examples are, one, the project only looks at listed fish, ESA fish, not red band trout, which are widely distributed on the forest. These conclusions that they make are only relating to fish protected under the Endangered Species Act, which are salmon. A wide variety of fish, red band trout being the biggest example, is not incorporated in that analysis. That's one. It's not looking at adverse impacts to non-listed fish. Two, it's not looking at impacts. Under NFISH, the forest service has to determine whether there's going to be measurable degradation of the riparian areas as quantified by the six riparian management objectives. And NFISH PACFISH requires that analysis to occur in all streams within the forest. When the forest service goes and only looks at critical habitat, which is a very small subset of those streams on the forest, they're not performing an analysis which is equivalent to the analysis they would have to perform under NFISH, which is to look at the baseline condition of all the streams that contain anadromous fish and inland fish, and then analyzing whether there'd be a measurable degradation of any of the riparian habitat, healthy habitat quantifiers from the project's impacts. The EIS doesn't even contain a baseline condition of any of these streams, which would be the starting point to determine whether there'd be measurable degradation. Is there a different burden on the forest service under NFMA versus NEPA with respect to the NFISH PACFISH analysis, or is it the same? There are two separate claims. Here, we're saying the analysis is not in the environmental impact statement or in the record, so it's a violation of both NFMA and NEPA. The claims are different to the extent that the forest service, if they could, point to the record somewhere where there was an NFISH PACFISH consistency analysis outside of the EIS, that arguably would comply with NFMA, but wouldn't comply with NEPA because it's not contained in the NEPA documents. I see. Alternatively, the forest service could analyze that there would be an incredible inconsistency with PACFISH, NFISH, and the NEPA documents, which would satisfy their NEPA obligations because it's only a procedural statute, but conversely would violate the substantive requirements of NEPA. But what we're saying here is because that analysis isn't contained anywhere, either in the administrative record or the EIS, it's a violation of both NEPA and NEPA because NEPA requires the forest service to take a hard look at the project's impact so that the decision maker and the public can determine whether the project is going to meet all the requirements of the law and the forest plan. And NFMA requires the forest service to ensure consistency with the forest plan and all of its activities, and NFISH is part of the Wallowa-Whitman Forest Plan. Okay. I want to really briefly, in my last few minutes here, touch on, again, why this is important for the forest service to consider NFISH under NEPA, what the district court found is that there is no requirement to consider this particular environmental law. But, as we've mentioned, this isn't a backwater standard of the forest plan. This is the way that the forest service has determined they're going to analyze herbicide impacts to riparian areas. This is a standard for applying herbicides that the forest service promulgated specifically to do an effects analysis, and it's not mentioned anywhere in this herbicide project EIS. The agency has an obligation to consider every significant aspect of the environmental impact of a project. PACFISH itself says evaluation of site-specific projects and activities happens through site-specific analysis that occurs through NEPA, and that's what assures consistency with the riparian management objectives. The forest service themselves said in the programmatic EIS, which they did back in 2005, that site-specific compliance of PACFISH NFISH is not going to be determined at the programmatic level, but that will be done at the site-specific level. It wasn't done here. In scoping, the forest service and the public identified five significant issues to be explored in the EIS. One of those issues is aquatic impacts and effects on riparian habitat. The NEPA regulations clearly require the forest service to analyze compliance with the forest plan and environmental laws meant to protect the environment on these specific issues. And again, the reason this is important is because members of the public and the decision maker can't piece together an NFISH analysis from what the forest service did say in the EIS. This frustrates the purpose of NEPA by depriving the public and the decision maker from a hard look at the project's impacts on the riparian area. And if I could, I'll go ahead and reserve the rest of my time. That's fine. May it please the Court, I am David Shilton here representing the Forest Service. I'll first discuss the jurisdictional issue. I think the heart of the jurisdictional issue is generally that parties are not allowed to appeal under 1291 until there is a final judgment as to the final judgment. What is the final judgment? Not as to all claims. And that the judgment as to the PACFISH-NFISH claims, one could say was final. But the cumulative impact claims are continuing now on a remand. And so in that situation, we think that the rules. What do you do with our case law? Well, the two recent cases, Sherman and Honolulu, certainly make it murkier and more difficult for us. However, what those cases indicate, I think, is that you look at it in a practical way, and the considerations you look at are would waiting until a true final judgment on all claims deprive the plaintiffs of a meaningful appeal. We think that would not be the case here. True, there is some limited spraying going on now. As the district court's vapid opinion explains, it's a little over 5,000 acres. And that spraying won't preclude this Court from resolving the PACFISH-NFISH issues at the end of the day when the remand is finished. So we think they would get a meaningful appeal if the Court waited. The other factor is. Well, why doesn't the agency wait? Well, as Mr. Jerger is correct, that the agency right now in the remand is focusing on the cumulative impacts issue, not the PACFISH-NFISH issue. However, it's possible that in that. So it should wait, then, if your interest aligns with the public interest in protecting the environment. We don't know what the effects of all these insecticides are going to have on the water or on other fish. That's what we're talking about. But you want to rush in and start spraying. It's just a little piece of the forest over there, so why not wait? So I think the point is that in the remand, it's possible that the plaintiffs could get the relief they seek, which is less use of herbicides, if the agency were to determine that cumulative impacts were a problem and required less spraying. So we think it's not a meaningless remand, which is another effect. So the agency is conducting a little experiment. Is that it? No, it's simply pursuant to the district court's order. It's reconsidering the cumulative impacts. The district court found all of the rest of the decision, all of the rest of the EIS, was adequate. And that's the plaintiffs have only appealed on one of those issues, which is the in-fish, pack-fish. But I think, you know, that goes to the merits issue of whether the agency adequately considered in-fish and pack-fish, and it did. The district court's. Not explicitly. Well, it did explicitly find. Say, here's in-fisher, all the criteria, go through each one. Right. I mean, as Judge Watford pointed out, though, I mean, in substance, there's discussion about the various issues under the in-fish, pack-fish. There is a lot of discussion. And what the discussion of consistency, which is found at the excerpts of record page 168, where it finds that this would comply with pack-fish, in-fish standards and guidelines, is it points the reader to Chapter 3 of the EIS for a discussion of, you know, what the various impacts would be. It points the reader to Chapter 2 of the EIS for a discussion of how the project design features and the buffers will avoid adverse impacts. And so there is a lot of discussion that pertains to the question that pack-fish, in-fish poses, which is will this plan avoid adverse impacts, which the plan says avoid means to avoid to the extent practical. It's a planning standard. It's not a strict regulatory standard like the Endangered Species Act. And the EIS is replete with analysis of why these protections will avoid impacts to the extent practical and will minimize those impacts. So if the plaintiffs or some other agency or commenter ---- So how do you decide if it's practical? I'm sorry. I didn't understand the question. How does the agency make a decision as to what is practical? Thank you. Well, they determine with herbicides it's usually quite practicable to avoid alternatives by saying you simply can't spray within 100 feet of perennial streams. And that's what they did. And then with aerial spraying, you can't spray within 300 feet of perennial or intermittent streams. So it was practicable in this instance to avoid impacts by those sorts of buffers. And there's a great deal of discussion in Chapter 2 of how the buffers work, how the various project design features work, which are very strict. To do anything close to a stream, generally the Forest Service will have to use spot spraying, which is spraying individual plants or using wicking on individual plants, to make sure that none of the herbicides do get into the water. It's a very careful, well-thought-out plan. And the district court, I think, asked the right question here, which is under the arbitrary and capricious test, can one reasonably discern why the agency determined that this project was consistent with PACFISH and NFISH? Well, let me ñ I'd like to hear your response to ñ you heard your opponent explain why, in his view, the ESA analysis is not an adequate proxy for the NFISH-PACFISH analysis. And in particular, he said that you guys didn't take into account the impacts on all of the streams, you just took into account the impacts on streams that were within the critical habitat designation. And that seems like it would be a significant defect, if that's accurate. So I'd like to hear your response to that. Yes, in fact, the things that were mentioned are considered in the EIS. Let me go through that. It was mentioned about that the EIS doesn't consider red-band trout because they're not a listed species. In fact, it does, at excerpts of record 468 to 469. The red-band trout are considered, as are the other species of trout that were mentioned, the west slope cutthroat trout. And then with respect to bull trout critical habitat, that's discussed at excerpts of record 477 to 78. So that's fully considered. The EIS uses the Endangered Species Act critical habitat as the lens, its primary lens, for determining impacts. And that's appropriate because the Endangered Species Act is a very strict standard. It's not like a planning standard which says avoid impacts to the extent practicable. It says you cannot cause jeopardy or adverse modification of critical habitat unless you get an exemption from the God Squad Committee. So it's a stricter standard, and the agency complied with that. There was a biological opinion done by the National Marine Fisheries Service and one done by the Fish and Wildlife Service for bull trout. And both of those found that this action would not jeopardize the listed species. And no one objected to those findings. So by doing it under the stricter standard, I think everything that would be considered under the pack fish in fish standard was considered. And again, the pack fish in fish standard is a standard under the National Forest Management Act, which is a planning statute. It basically says when you're doing your site-specific agency plans, you need to be consistent with the forest plan. It doesn't say that you have to do a consistency analysis. It just says be consistent. And there are a lot of provisions in those forest plans. So typically the Forest Service will state in an EIS this project is consistent with the forest plan. But unless someone like the plaintiffs or an agency has brought up a particular problem with consistency, they don't go beyond that. And there's no requirement that they do so. And I think that the fact that the plaintiffs in their comments on the draft EIS didn't say anything about that they thought there was a problem with consistency shows that it was reasonable for the agency to simply state that this is consistent and to point the reader to Chapters 2 and 3 for the analysis of that. And to require a separate analysis for each statute that pertains to fishery protection would greatly, I think, extend EISs, which are already very long, as the Court knows. So I think that the Forest Service was proceeding in a reasonable fashion in that manner. And the National Environmental Policy Act doesn't require anything more than what the agency did here. First of all, under NEPA, this Court and the Supreme Court have said that the plaintiffs have to bring their concerns to the agency's attention when they comment on the draft EIS. And here the plaintiffs did not bring the specific concern of alleged inconsistency with package standards to the agency's attention. Second, NEPA says you're supposed to focus on the significant environmental issues. Here the agency focused on potential impacts to fish and aquatic habitat, went through that very thoroughly. But the issue of whether the particular standards of temperature, bank stability, woody debris and so forth, whether there was consistency with those standards, that was not a significant issue. Nonetheless, it is discussed, and I do want to make that clear, as the district court pointed out, temperature, bank stability, woody debris, all of those are discussed in the EIS. And what it finds is that there won't be any impacts on those because herbicide spraying, when you control the invasive species, the invasive species aren't providing any shade for temperature effects. They're not providing good bank stability. So what the herbicide application does over the long term is improve all of those management objectives. Temperatures will be better, bank stability will be better when native vegetation is able to reestablish itself. So the Forest Service had a significant problem here with invasive weeds in this area. Under the old regime, where they only used herbicides as a last resort, the weeds, the invasive species, had basically quadrupled in a 16-year period. Under the new plan, herbicides will be used very carefully and in accordance with these protections, and the Forest Service found that over time that will have a beneficial impact to fish and aquatic habitats. Unless there are other questions. Thank you. Okay. Thank you. Thank you, Your Honor. Really quickly on the jurisdictional issue, they're spraying on the forest now, and I think that under all of the cases that would be considered enough to constitute final judgment on the infish. Keep your voice up. On the infish-packed fish claims since they're spraying now on the forest. Two, infish contains tougher and more stringent standards than the ESA. The riparian standard, RA3, is not in the ESA. The idea that you cannot measurably degrade habitat objectives is not in the ESA. The ESA analysis looks at adverse effects to populations of fish. Infish and packed fish look at adverse effects to individual fish. The ESA looks to see whether critical habitat will be adversely modified or degraded. Infish-packed fish requires all streams in the project area not to be adversely modified or degraded. And to respond to, therefore, in response to counsel's argument that, you know, what is the definition of adverse effects, it doesn't matter because it's not there. There's nothing in the EIS that would discuss adverse effects to these specific criteria. And the EIS's discussion of mitigation measures, as counsel pointed to, is not enough. This Court has found that a performance. So let me ask you this. Bottom line, I mean, what your view is is that the EIS, or there should have been someplace in the record that specifically addressed packed fish, infish? Well, this is an herbicide project. The Forest Service drafted in infish a standard for applying herbicides to riparian areas. They didn't discuss that standard anywhere in the EIS. They made a couple conclusions that the project would be consistent with those standards but didn't attempt to flange that conclusion with the requirements of RA3. And we don't think that that meets the analysis under NEPA. For example, counsel mentioned that red band trout impacts and bull trout impacts are discussed in the EIS at ER 468, 469 for red band and 477, 478 for bull trout. There's nothing there but a description of the species that says they exist on the forest. That's all that those pages say. There's no analysis of the project's effect on those species' habitat or the individual populations of those species that inhabit specific non-critical habitat streams on the forest. And I disagree with counsel's assertion that there doesn't need to be a demonstration of consistency under NIFMA. The case law requires not just a conclusion that it's consistent with NIFA but a demonstration. That's the land's council case, some sort of discussion of how these conclusions and what sort of analysis was done to reach this conclusion, not just a conclusory statement with absolutely no analysis. The court has said they can't defer to a void, and that's what we have here, a conclusion that's not attached to any sort of analysis at all. And just really quickly to address the exhaustion issue, the Forest Service hasn't appealed that the plaintiffs failed to exhaust their administrative remedies. Plaintiffs did bring up these issues in their comments quite a bit. They didn't use the word compliance with standard RA-31 of NFISH a lot, but they're not required in the Circuit to enchant magic legal terms of art. They talked a lot about riparian impacts and impacts to aquatic species from the application of herbicides, and that's all that's required to satisfy the exhaustion standard. And really the issue there is whether the Forest Service was on notice of this. This is their own standard. It's in the forest plan, and as I mentioned before, it was brought up consistently by the public in scoping and identified as a significant issue, issues to water quality and aquatic species in a riparian environment. Okay. Thank you. Thank you, counsel. We appreciate your arguments, very interesting matters submitted at this time.
judges: Pregerson, Paez, Watford